UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| RONALD BRODEN, | ) | |
| | ) | Civil Action No. 21-cv-10411-VB |
| Plaintiff, | ) | |
| v. | ) | **AMENDED COMPLAINT** |
| | ) | |
| BORIS RUBINSTEIN, M.D., M.P.H., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

PLAINTIFF, RONALD BRODEN by and through his attorneys the Law Offices of Victor M. Feraru, bring this action against DEFENDANT BORIS RUBINSTEIN, M.D., M.P.H., and allege, upon information and belief, as follows:

**Preliminary Statement**

1. This is a case of a psychiatrist, DEFENDANT, a close family friend of PLAINTIFF, who for years saw PLAINTIFF for therapy, and for medical treatment for what PLAINTIFF thought and was led to believe was therapy and medical intervention for depression—not simply seeking a doctor for medication.

2. After nearly two-decades of PLAINTIFF seeing DEFENDANT for care, PLAINTIFF realized that DEFENDANT, in PLAINTIFF'S opinion, resented him—and resented PLAINTIFF'S mother, and as a result, as will be further set forth below, PLAINTIFF sent DEFENDANT letters, a diary of sort, airing his grievances with DEFENDANT, and including details about the decades long patient/physician relationship. As a result, DEFENDANT took all the information he knew as a psychiatrist, and a friend of PLAINTIFF'S family, and used it to exact punishment upon PLAINTIFF, and PLAINTIFF'S family. In doing so, DEFENDANT damaged and continues to damage PLAINTIFF in unthinkable ways.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction under 28 U.S.C. §1332(a)(1) because this case is a civil action where the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different States. The Plaintiff is a resident of Connecticut while the Defendant is a resident of New York.

4. Venue is set correctly in this District under 28 U.S.C. §1391(b) since Defendants transact business within this judicial District. Likewise, a substantial part of the acts and omissions causing this action occurred in the Southern District of New York. 28 U.S.C. § 1391(b).

5. Consistent with the Due Process Clause of the Fifth and Fourteenth Amendments, the Court has personal jurisdiction over Defendant because Defendant is present in the Southern District of New York, so requiring an appearance does not offend traditional notions of fair play and substantial justice. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Further, all of Plaintiff's claims arise from those Defendant engaged in in the Southern District of New York.

6. This Court also has personal jurisdiction over Defendant under and consistent with the Constitutional requirements of Due Process in that Defendants, acting through their agents or apparent agents, committed one or more of the following:

   a. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

   b. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

c. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if it

d. regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

e. expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or

f. owns, uses or possesses any real property situated within the state.

*See* N.Y. C.P.L.R. 302 (McKinney).

## JURY DEMAND

7.  The PLAINTIFF demands a trial by jury in this action.

## PARTIES

8.  At all times hereinafter mentioned, PLAINTIFF, RONALD BRODEN ("PLAINTIFF"), lives and resides in Easton, Connecticut.

9.  At all times hereinafter mentioned, upon information and belief, DEFENDANT BORIS RUBINSTEIN, M.D., M.P.H. ("DEFENDANT"), lives, works and resides in Westchester County, New York.

## STATEMENT OF FACTS
### Defendant his Deep Ties with Plaintiff's Family

10.  DEFENDANT grew up with PLAINTIFF'S mother, having met PLAINTIFF'S mother in Mexico. DEFENDANT remained close with PLAINTIFF'S family from the earliest of PLAINTIFF'S memories.

11. In or about 1999, PLAINTIFF confided to his family that he was having deep feelings of depression. His family suggested that PLAINTIFF see DEFENDANT for help in resolving his depression.

12. In or about September of 1999, PLAINTIFF met with DEFENDANT, who was a close family friend for full-service psychiatry, meaning PLAINTIFF would receive therapy, and medical treatment from DEFENDANT.

13. Until then, PLAINTIFF only knew DEFENDANT to be a very close family friend, who would routinely join the family on special occasion, and PLAINTIFF'S family would join DEFENDANT as well.

14. From the onset, in or about the year 1999, PLAINTIFF thought of DEFENDANT as a doctor PLAINTIFF felt he could trust.

15. From the onset, in or about the year in 1999, DEFENDANT charged PLAINTIFF around or about half his normal fee for the first 4 months, and thereafter, DEFENDANT stopped billing PLAINTIFF, seeing the PLAINTIFF for free because of DEFENDANT'S relationship with DEFENDANT'S family.

16. Around or about the year 2002, PLAINTIFF was not benefiting from the therapy DEFENDANT was providing—as it appeared that DEFENDANT had apathy towards PLAINTIFF. However, PLAINTIFF continued seeing DEFENDANT—he did not want to offend his family friend. DEFENDANT never referred PLAINTIFF to another provider, and instead continued to see PLAINTIFF with the full understanding that PLAINTIFF vocalized the lack of benefit from the therapy sessions.

17.     PLAINTIFF continued to see DEFENDANT as a therapist/doctor from 1999 until around or about 2019.

### Defendant Did Not Share Plaintiff's Diagnosis with Plaintiff Communicated Intimate Details of Plaintiff's Care with Plaintiff's Family

18.     At all times relevant to this Complaint, DEFENDANT diagnosed PLAINTIFF with Bipolar Two Disorder without informing DEFENDANT of such, ever.

19.     At all times relevant to this Complaint, DEFENDANT prescribed Klonopin to PLAINTIFF in large doses, up to 6 mg, a day. PLAINTIFF assumed it was for his anxiety.

20.     At all times relevant to this complaint DEFENDANT began showing his disdain for PLAINTIFF when he would delay in refilling the highly addictive Klonopin.

21.     In or about 2018 DEFENDANT began to show passive aggressive behaviors towards PLAINTIFF by making PLAINTIFF call numerous times to refill medications and cutting sessions much shorter than the session's scheduled time.

22.     At all times relevant to this Complaint, from 1999 until 2019, DEFENDANT would have monthly dinners, and/or meals, with PLAINTIFF'S father, during which time DEFENDANT would share highly personal details about PLAINTIFF'S treatment and care.

23.     At all times relevant to this Complaint, DEFENDANT did not have written or verbal authorization to speak about PLAINTIFF'S care with PLAINTIFF'S family.

### Plaintiff Shares his Utter Distain for Defendant; Defendant Responds in Violation of His Duty to Plaintiff

24.     Following a session PLAINTIFF had with DEFENDANT in or about April of 2019—PLAINTIFF wrote a series of strongly worded emails expressing all of the disdain had

5

built up in PLAINTIFF concerning DEFENDANT'S lack of care for PLAINTIFF as a therapist and doctor over the years.

25. Thereafter, in or about May of 2019, DEFENDANT phoned PLAINTIFF and said "I failed you, I didn't take proper care of you. I'm sorry. I apologize," followed by a suggestion PLAINTIFF bring in his parents in for one last session for closure.

26. PLAINTIFF took DEFENDANT up on his idea, and on or about May 22, 2019, PLAINTIFF, with his father, went to DEFENDANT'S office for the purposes of bringing closure to nearly two-decades of parents to his office for closure and what PLAINTIFFexpected to be an apology to them.

27. On or about May 22, 2019, PLAINTIFF joined by his father, met with DEFENDANT who was immediately defensive. DEFENDANT cursed at PLAINTIFF, and then "fired," or terminated, PLAINTIFF as patient, all while PLAINTIFF'S father helplessly watched.

28. Following DEFENDANT'S May 22, 2019, tirade upon PLAINTIFF, with PLAINTIFF'S father watching in dismay PLAINTIFF left reviews on the internet, giving his opinion of DEFENDANT, in light of the circumstances he'd experienced.

29. Following DEFENDANT'S May 22, 2019, tirade upon PLAINTIFF, with PLAINTIFF'S father watching in dismay PLAINTIFF wrote scathing emails to DEFENDANT concerning his thoughts and opinions of DEFENDANT, in light of the circumstances. DEFENDANT did not reply to those emails.

30. Thereafter, in or about February of 2020, after PLAINTIFF had posted a number of his opinions of DEFENDANT in reviews, DEFENDANT visited PLAINTIFF'S parents to

discuss the private emails, mentioned above, he'd received from PLAINTIFF. DEFENDANT also showed the private communications PLAINTIFF had written him.

31. At the same time, DEFENDANT also shared private details of PLAINTIFF'S therapy, and treatment with PLAINTIFF'S family—for the express purposes of mortifying PLAINTIFF'S family and using PLAINTIFF'S family to leverage PLAINTIFF into removing the reviews that PLAINTIFF had posted.

32. At the time same, DEFENDANT threatened PLAINTIFF'S parents that he would have to involve law enforcement, and an attorney, if PLAINTIFF did not remove the reviews—and the private emails he was receiving.

33. At all times relevant to this Complaint, PLAINTIFF did not authorize DEFENDANT to share the details of his treatment or conversations with *anyone*.

### Defendant's Calculated Conversation Damages
### Plaintiff in the Most Unthinkable Ways

34. As a result, DEFENDANT'S visit with PLAINTIFF'S family, PLAINTIFF and his mother have not spoken, since.

35. DEFENDANT knew from his time giving therapy and medical treatment to PLAINTIFF, of DEFENDANT'S particular views of PLAINTIFF'S mother—from a lifetime of knowing PLAINTIFF'S mother, he knew what would get a "rise" out of her. DEFENDANT used his knowledge of PLAINTIFF'S medical condition, and of PLAINTIFF'S vulnerability, using such to "get back" at PLAINTIFF for posting bad reviews of DEFENDANT and sharing with DEFENDANT what he thought of him.

36. DEFENDANT knew that contacting PLAINTIFF'S mother, to share private communications, about private issues between himself and his patient, that would cause PLAINTIFF'S mother to react negatively towards PLAINTIFF.

37. The result of DEFENDANT visiting PLAINTIFF'S mother, and family, had exactly the impact on PLANTIFF that DEFENDANT intended, it completely ruined the relationship PLAINTIFF has with his elderly mother, and destroyed with stress and suffering PLAINTIFF'S father, who has watched his family be torn apartment by DEFENDANT'S sharing of PLAINTIFF'S issues with him—which in turn has caused extreme anguish within PLAINTIFF.

38. In or about early 2021, PLAINTIFF'S mother informed PLAINTIFF, that because of what she learned from DEFENDANT'S visit, concerning PLAINTIFF and DEFENDANT'S issues, that she was now reducing the amount of money he would receive from his family when they passed, PLAINTIFF learned the amount his inheritance was reduce by is approximately $700 thousand.

39. As a result of DEFENDANT'S improper interaction with information he learned from PLAINTIFF, his patient, that was relayed, without PLAINTIFF'S authorization by DEFENDANT, to PLAINTIFF'S family, PLAINTIFF'S relationship with his entire family is now strained and is forever damaged, during the last years of his parents' lives, as PLAINTIFF'S mother and father are elderly. DEFENDANT knew that this would be the effect of his interactions with PLAINTIFF'S family, in sharing information that he shared with, as is set forth in this complaint.

40. As a result of DEFENDANT'S violations of patient confidentiality, and of DEFENDANT'S use of PLAINTIFF'S private information to harm PLAINITFF, PLAINTIFF'S

ability to trust and or benefit from essential psychotherapy from other providers is greatly hindered, and as a result, PLAINTIFF suffers, and will suffer, diminished mental health.

## AS AND FOR A FIRST CAUSE OF ACTION
(Negligence)

41. PLAINTIFF re-alleges the allegations in all prior paragraphs, and further alleges that, DEFENDANT owed a duty to PLAINTIFF as his therapist and doctor not to intentionally harm PLAINTIFF.

42. As set forth above, DEFENDANT breached that duty to PLAINTIFF when DEFENDANT intentionally, with malice aforethought, spoke about PLAINTIFF'S diagnoses with DEFENDANT'S family because, among other things, he was angered over online reviews PLAINTIFF had left on the internet, as set forth above. DEFENDANT knew how to manipulate PLAINTIFF'S family against him and exploiting weaknesses in the relationship between PLAINTIFF and his family, learning what DEFENDANT had learned from PLAINTIFF'S sessions with him in therapy, to use it against PLAINTIFF.

43. PLAINTIFF has and continues to be financially, mentally, and physically damaged by DEFENDANT'S negligence.

44. For the above-mentioned reasons, PLAINTIFF is entitled to judgment against DEFENDANT in an amount to be determined at trial; however, in no event less than ONE MILLION ($1,000.000.00) DOLLARS.

## AS AND FOR A SECOND CAUSE OF ACTION
(Breach of Physician Patient Confidentiality)

45. PLAINTIFF re-alleges the allegations in all prior paragraphs, and further alleges that PLAINTIFF and DEFENDANT had a physician-patient relationship for nearly twenty-

years, as DEFENDANT rendered professional medical services to PLAINTIFF, which PLAINTIFF accepted for the purposes of medical health treatment.

46. As set forth above, DEFENDANT was in possession of information relating to the PLAINTIFF'S treatment and diagnosis

47. As set forth above, DEFENDANT repeatedly disclosed confidential information to persons not connected with the Plaintiff's medical treatment, by directly identifying PLAINTIFF as patient.

48. DEFENDANT had a complete lack of consent for such disclosure of PLAINTIFF'S confidential medical information.

49. PLAINTIFF is and continues to be permanently damaged by DEFENDANT'S breach, included but not limited to the collapse of PLAINTIFF'S family relationships, the quality of PLAINTIFF'S mental health—as PLAINTIFF has a strong general distrust of other psychiatrists and therapists—causing him great mental anguish that in turn creates physical health problems for DEFENDANT which has suffered since DEFENDANT'S egregious and numerous breaches of physician/patient confidential DEFENDANT owed PLAINTIFF.

50. For the above-mentioned reasons, PLAINTIFF is entitled to judgment against DEFENDANT in an amount to be determined at trial; however, in no event less than ONE MILLION ($1,000.000.00) DOLLARS.

**WHEREFORE**, PLAINTIFF respectfully requests judgment as follows:

A. On the 1st and 2nd Causes of Action, a money judgment in an amount to be determined at trial; however, in no event less than ONE MILLION ($1,000.000.00) DOLLARS, together with costs, disbursements, and reasonable attorney's fees.

  B. Granting PLAINTIFF such other and further relief as the Court deems just and proper.

Dated: December 9, 2021
Long Beach, New York

            Respectfully submitted,
            LAW OFFICE OF VICTOR M. FERARU

            _____
            VICTOR M. FERARU
            200 Old Country Rd., Ste 2 South
            Mineola, NY 11501-4242
            T: 516-415-2114
            E: victor@vicslaw.com
            Attorney for PLAINTIFF