UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
RONALD BRODEN,                                    :
                              Plaintiff,          :
                                                  :          **OPINION AND ORDER**
v.                                                :
                                                  :          21 CV 10411 (VB)
BORIS RUBINSTEIN, M.D., M.P.H.,                   :
                              Defendant.          :
-------------------------------------------------------------x

Briccetti, J.:

    Plaintiff Ronald Broden brings this action against defendant Boris Rubinstein, M.D.,

M.P.H., plaintiff's former psychiatrist, for breach of physician-patient confidentiality.

    Now pending is defendant's motion for summary judgment.  (Doc. #91).

    For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN

PART.

    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

## BACKGROUND

    The parties have submitted memoranda of law, statements of undisputed material facts

pursuant to Local Civil Rule 56.1, and supporting declarations and exhibits.  Together, they

reflect the following factual background.

I.    Purported Confidentiality Breaches and Waivers

    Defendant and plaintiff's father, Dr. Alex Broden, were psychiatrists with a close

personal and professional relationship.  In 1999, plaintiff began receiving psychiatric treatment

from defendant.  Defendant treated plaintiff with varied frequency for nearly twenty years and

remained plaintiff's psychiatrist until June 22, 2019.  Throughout defendant's treatment of

plaintiff, defendant met regularly with plaintiff's father.  Plaintiff claims defendant disclosed

details of his treatment to his father, which defendant denies.

1

Before plaintiff began treatment with defendant, he engaged in an extramarital affair with a married woman for around six months.  Around the year 2000, plaintiff visited the woman's home with flowers in a failed effort to win back her affection (the "Flower Incident").  Plaintiff sent a letter to the woman's husband revealing the affair, after which the couple reported the affair to plaintiff's employer and plaintiff was forced to resign.  Plaintiff then attempted to extort money from the woman's husband, for which he was arrested and convicted of attempted grand larceny and sentenced to five years' probation.  Plaintiff claims he told only defendant about this incident.  However, on September 5, 2018, plaintiff received an email from his brother Ted referring to plaintiff appearing at the woman's home and threatening to reveal the affair.

Between April 25, 2019, and February 17, 2020, plaintiff sent defendant numerous emails criticizing, among other things, the care defendant rendered to him.  In emails directed only to defendant, plaintiff referenced defendant prescribing him anti-psychotic medications, including Seroquel and Risperdal.

Plaintiff disclosed some details of his treatment to his parents and his brother Dan in emails.  On May 23, 2019, plaintiff emailed defendant, copying plaintiff's parents and Dan, referencing many discussions from plaintiff's treatment over the past decade, including evidence that plaintiff was depressed, had spent a night in jail for extortion, was prescribed Klonopin and was dependent upon it, and had a history of abusing alcohol.

On August 22, 2019, plaintiff emailed his parents regarding their offer to help him see a therapist, in which he referenced that at their last session, defendant told plaintiff he did not believe it was his job to tell plaintiff what to do even though defendant knew plaintiff was psychotic, delusional, and depressed; and that defendant's notes indicated plaintiff was bipolar

and had PTSD.  The emails from plaintiff to his parents and brother do not mention defendant

prescribing him anti-psychotic medications, including Seroquel and Risperdal.

Plaintiff told defendant to reach out to his family members on three occasions.  In an

email dated August 18, 2019, plaintiff wrote:  "You need to call my parents!!!! . . .  It doesn't

matter that I told them you knew I was bipolar and said nothing. . . .  You need to call them and

say:

> "On account of my lifelong relationship with you and our close friendship I feel I
> need to tell you that I seriously failed your son.  I never told him of his bipolar
> disorder and said nothing about his buying the club and leaving his family in spite
> of what he did to lose his job and spend a night in jail.  I knew he was ill but I
> treated him with the same don't ask, don't tell policy that has been my approach
> throughout my career.  I could have helped him understand his mental disorder and
> get his life back but I didn't.  When he no longer wanted to see me a few years later
> stating that therapy wasn't working for him I never suggested he see someone else
> knowing that he wasn't well.  When he came to me he had everything and under
> my care lost everything.  Somehow I never considered that had anything to do with
> me.  Ronny is a good, caring man who is overcome with guilt, shame and regret.
> He lost everything under my care and is dealing with great trauma.  I realize that it
> had everything to do with me.  There is nothing I can do to undo the harm I did to
> him and, by extension to his sons, Rhonda and the two of you, but I want to pay for
> him to see an excellent psychologist to help him get his life back.  Given his limited
> finances and unable to pay for a qualified therapist, the least I can do is pay for his
> therapy.  I will ask Ronny to give me the name of the psychologist he wishes to see
> and instruct him to send invoices to my office.  I hope that he will be able to find
> peace and enjoy the rest of his life in a way that without therapy he probably will
> not."

(Doc. #92-14 at 23).

In an email dated November 14, 2019, plaintiff criticized defendant for not having called

plaintiff's parents and wrote:

> You are going to call both my parents.  You are going to explain to my mother the
> horror that I got in you.  You are going to apologize to them for what I went
> through under your care and for what how my sons suffered and I am going to get
> a call from them each detailing what you said.

(Doc. #92-14 at 33).  Plaintiff reiterated defendant should "make a sincere apology for the horror

of a quack I got in you."  Id.

3

One week later, in an email dated November 21, 2019, plaintiff said he would take down negative reviews of defendant only if he called plaintiff's mother and told her "how ill I was and the piece of shit I got in you." (Doc. #92-14 at 35).

On February 20, 2020, defendant and his wife visited plaintiff's parents at their home. Defendant showed plaintiff's parents the emails he received from plaintiff between April 25, 2019, and February 17, 2020, including those discussed above.

II.     <u>Plaintiff's Purported Injuries</u>

Plaintiff claims he was injured by defendant's purported breaches through (i) a reduction of his inheritance; (ii) physical injuries caused by a heart attack and a gastrectomy; and (iii) loss of wages and benefits.

    A.     <u>Reduction of Inheritance</u>

On September 12, 2020, plaintiff's mother emailed her attorneys regarding changes to her will, including bequests for plaintiff's children and ex-wife "that will come out of [plaintiff's] third of our estate." (Doc. #101-2). On February 2, 2021, plaintiff's mother requested another change to her and plaintiff's father's wills that reduced plaintiff's inheritance by $400,000.

On February 17, 2021, plaintiff's mother emailed plaintiff regarding his inheritance. Noting altercations plaintiff had with his family members and the emails he had sent to his family and defendant, she wrote:

> And because I am a believer that all actions have consequences, I need you to know that your share of the pot of gold at the end of the rainbow, has been reduced. If you EVER, EVER abuse me or come at me with your anger or insult me again or lie to me about your wonderful sons or lie to them about me . . . I will make provisions for Ula and Hannah [plaintiff's wife and daughter] but the rest of your share will shrink once again.

(Doc. #92-15) (ellipses included in original).

4

       B.     <u>Physical Injuries</u>

On June 2, 2021, plaintiff was admitted to Yale New Haven-Bridgeport Hospital for a heart attack.  Hospital staff determined plaintiff's heart attack was caused by a blockage in his arteries.  Plaintiff's medical records do not indicate stress as a factor contributing to the onset of his heart attack.

In addition, plaintiff had been seeing a gastroenterologist since June 2020, and was diagnosed with "alcoholic gastritis."  (Doc. #92-24 at 142).  On September 27, 2021, plaintiff underwent a partial gastrectomy to treat a gastric ulcer.  Plaintiff's medical records do not indicate stress as a factor contributing to the onset of his gastritis.

Plaintiff's medical experts' reports do not include any opinion as to the cause of plaintiff's heart attack or gastrectomy.

       C.     <u>Loss of Wages and Benefits</u>

Plaintiff worked as a cantor throughout his career.  Plaintiff's voice became somewhat impaired around 2006.  Starting in 2014, following the surgical removal of a polyp, plaintiff's vocal condition worsened, which plaintiff attributes to his abuse of alcohol to alleviate his continued depression and anxiety.  Plaintiff has since undergone several procedures to restore his voice.

Plaintiff's vocal ailments impaired his ability to work as a cantor in synagogues.  Despite these health challenges, plaintiff found work opportunities requiring less vocal strain, becoming a life cycle religious leader at Jewish weddings, bar and bat mitzvahs, funerals, and other events.

Plaintiff claims defendant's alleged unauthorized disclosure of confidential emails to plaintiff's parents, and the subsequent damage to plaintiff's familial relationships, elevated his stress level such that plaintiff was unable to sleep, causing his voice to get much worse and

further impairing his ability to find work.  In 2021, plaintiff missed three months of work, which

he claims was related to the health issues caused by his stress.

**DISCUSSION**

I.    <u>Standard of Review</u>

The Court must grant a motion for summary judgment if the pleadings, discovery

materials before the Court, and any affidavits show there is no genuine issue as to any material

fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law

. . . .  Factual disputes that are irrelevant or unnecessary" are not material and thus cannot

preclude summary judgment.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).[1]

A dispute about a material fact is genuine if there is sufficient evidence upon which a

reasonable jury could return a verdict for the non-moving party.  <u>See</u> <u>Anderson v. Liberty Lobby,</u>

<u>Inc.</u>, 477 U.S. at 248.  The Court "is not to resolve disputed issues of fact but to assess whether

there are any factual issues to be tried."  <u>Wilson v. Nw. Mut. Ins. Co.</u>, 625 F.3d 54, 60 (2d Cir.

2010).  It is the moving party's burden to establish the absence of any genuine issue of material

fact.  <u>Zalaski v. City of Bridgeport Police Dep't</u>, 613 F.3d 336, 340 (2d Cir. 2010).

"When, as in this case, the burden of proof at trial would fall on the nonmoving party, the

moving party can shift the initial burden by pointing to a lack of evidence to go to the trier of fact

on an essential element of the nonmovant's claim.  If the moving party carries its burden, the

---

[1]    Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

nonmoving party must come forward with evidence that would be sufficient to support a jury verdict in its favor." McKinney v. City of Middletown, 49 F.4th 730, 738 (2d Cir. 2022).

If the non-moving party has failed to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 322–23. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50. However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011). "The mere existence of a scintilla of evidence in support" of the non-moving party's position is likewise insufficient; "there must be evidence on which the jury could reasonably find for" the non-moving party. Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary judgment is sought, summary judgment is improper. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004).

The Court need consider only evidence that would be admissible at trial. Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998). Bald assertions, unsupported by admissible evidence, are thus not sufficient to overcome summary judgment. Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991).

II.    <u>Claim for Breach of Physician-Patient Confidentiality</u>

Plaintiff's claim for breach of physician-patient confidentiality arises from two sets of purported breaches by defendant:  (i) the disclosure of the Flower Incident sometime on or before September 5, 2018, and (ii) the disclosure of plaintiff's emails at the February 20, 2020, meeting between defendant and plaintiff's parents.

The elements of a claim for breach of physician-patient confidentiality are:

(1) the existence of a physician-patient relationship; (2) the physician's acquisition of information relating to the patient's treatment or diagnosis; (3) the disclosure of such confidential information to a person not connected with the patient's medical treatment, in a manner that allows the patient to be identified; (4) lack of consent for that disclosure; and (5) damages.

<u>Chanko v. Am. Broad. Cos. Inc.</u>, 27 N.Y.3d 46, 53–54 (2016).

"A particularly compelling rationale for confidentiality exists in a case involving a psychiatrist, since the very nature of psychiatric treatment renders privacy essential." <u>Farrow v. Allen</u>, 608 N.Y.S.2d 1, 2 (1st Dep't 1993).  The privilege "covers all information relating to the nature of the treatment rendered and the diagnosis made," including "information orally communicated by the patient" and "ascertained by observing the patient's appearance and symptoms, unless those factual observations would be obvious to lay observers." <u>Chanko v. Am. Broad. Cos. Inc.</u>, 27 N.Y.3d at 53.  Moreover, "information obtained in a professional capacity but not necessary to enable the physician to fulfill his or her medical role is a protected confidence, the disclosure of which constitutes professional misconduct in the absence of patient consent or legal authorization." <u>Id</u>.  "The privilege should be given a broad and liberal construction to carry out its policy." <u>Id</u>. at 52.

Defendant argues he is entitled to summary judgment on plaintiff's breach of physician-patient confidentiality claim because (i) the statute of limitations bars the purported breach

regarding the Flower Incident, and (ii) plaintiff waived his right to confidentiality with respect to defendant's disclosure of plaintiff's emails to his parents.

    A.    <u>Statute of Limitations</u>

    Defendant argues plaintiff's breach of physician-patient confidentiality claim is barred by the applicable statute of limitations.

    The Court agrees in part.

    Under New York law, the statute of limitations for a breach of confidentiality claim is three years. N.Y. C.P.L.R. § 214(5); <u>Tighe v. Ginsberg</u>, 540 N.Y.S.2d 99, 101 (4th Dept. 1989). Generally, "the statute of limitations runs from the time of the breach." <u>Henry v. Bank of Am.</u>, 48 N.Y.S.3d 67, 69 (1st Dep't 2017).

    Plaintiff commenced this action by filing a complaint on December 6, 2021. Therefore, plaintiff's claims for conduct that occurred before December 6, 2018, are time-barred.

    Defendant argues the purported disclosure of the Flower Incident by defendant, as revealed to plaintiff by a September 5, 2018, email from plaintiff's brother, is time-barred. Plaintiff argues this is not time-barred because he did not realize defendant had shared the information with plaintiff's father until "shortly before Plaintiff's final session with Defendant on April 24, 2019." (Doc. #106 at 12). However, plaintiff cites no admissible evidence in support of this beyond the bare assertion in his memorandum of law. Even if it was properly supported, the relevant date for purposes of the statute of limitations is the date the breach occurred, not when plaintiff discovered it. See <u>Ackerman v. Price Waterhouse</u>, 84 N.Y.2d 535, 541 (1994) (holding the statute of limitations for a cause of action that sounds in tort, "absent fraud, accrues when an injury occurs, even if the aggrieved party is then ignorant of the wrong or injury"); <u>Bonner v. Lynott</u>, 166 N.Y.S.3d 325, 330 (3d Dep't 2022) (recognizing breach of

physician-patient confidentiality claim sounds in tort). Thus, because it is undisputed that defendant's purported disclosure occurred no later than September 5, 2018, it is barred by the statute of limitations.[2]

To the extent plaintiff argues the continuing wrong doctrine saves disclosures that occurred before December 6, 2018, the Court disagrees. The continuing wrong doctrine may only be predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct. The distinction is between a single wrong that has continuing effects and a series of independent, distinct wrongs." Henry v. Bank of Am., 48 N.Y.S.2d at 601. The doctrine saves "claims for recovery of damages but only to the extent of wrongs committed within the applicable statute of limitations." Id. (emphasis added).

Here, defendant owed plaintiff an ongoing duty of confidentiality, and each purported breach constitutes its own actionable wrong. However, to the extent the purported breaches constitute a series of wrongs, the doctrine only saves those wrongs committed after December 6, 2018. In other words, the doctrine ensures that the purported breaches committed before December 6, 2018, as part of a series of ongoing wrongs, do not bar recovery for those wrongs in the same series committed after December 6, 2018.

Accordingly, the Court grants summary judgment to defendant as to all purported disclosures before December 6, 2018, including the alleged disclosure of the Flower Incident.

---

[2]     To the extent plaintiff's claim for breach of physician-patient confidentiality is based on non-specific disclosures at dinners with plaintiff's father from 1999 to 2019 (Doc. #35 at 6), plaintiff fails to indicate any particular improper disclosures at any particular meeting. In any event, any disclosure occurring at any dinner meeting before December 6, 2018, is time barred.

B.    <u>Waiver</u>

Defendant argues three of plaintiff's actions demonstrate he waived his right to confidentiality:  (i) agreeing to have plaintiff's father join a meeting with defendant on May 22, 2019; (ii) disclosing confidential information in emails to his parents and brother before any alleged disclosure by defendant; and (iii) authorizing defendant to discuss plaintiff's treatment with plaintiff's parents in emails sent on August 18, November 14, and November 21, 2019.

The Court agrees in part.

"[O]nce a patient puts the information into the hands of a third party who is completely unconnected to his or her treatment and who is not subject to any privilege, it can no longer be considered a confidence and the privilege must be deemed to have been waived as to that information."  <u>Farrow v. Allen</u>, 608 N.Y.S.2d at 3.  "Once [plaintiff] waived that privilege for a particular purpose, the privilege was destroyed for all purposes, regardless of whether [plaintiff] had intended to limit his waiver."  <u>People v. Martinez</u>, 804 N.Y.S.2d 293, 293 (1st Dep't 2005).

"In determining the scope of a waiver effected by a patient's disclosure, however, there must be some consideration of the circumstances under which the disclosure took place and its impact on the opposing party."  <u>Farrow v. Allen</u>, 608 N.Y.S.2d at 4.  Moreover, while a party may waive the privilege, express authorizations "are strictly construed and limited to their express terms."  <u>Henry v. Lewis</u>, 478 N.Y.S.2d 263, 268 (1st Dep't 1984).

First, defendant claims plaintiff "expressly consented to the disclosure of the details of his treatment by agreeing to have his father join a meeting with defendant on May 22, 2019." (Doc. #93 at 4).  But the evidence defendant cites simply acknowledges that a meeting occurred, not that plaintiff gave any such express consent to disclose information related to his treatment at that meeting.  Moreover, plaintiff stated under oath that he invited his father to a meeting

between him and defendant so that his father "could witness the apology that I expected from the defendant." (Doc. #99 ¶ 3). A reasonable jury could infer plaintiff expected defendant to apologize to plaintiff's father and not that plaintiff authorized defendant to discuss the details of his treatment. Accordingly, the Court does not find plaintiff waived privilege as a result of agreeing to have his father join this meeting.

Second, defendant argues plaintiff waived his right to confidentiality by disclosing confidential information to his parents and brother. It is undisputed that the emails plaintiff sent to his family members referenced that: (i) plaintiff sought defendant's assistance with depression; (ii) defendant evaluated plaintiff as psychotic; (iii) plaintiff spent a night in jail for attempting to extort the husband of the woman with whom he had an affair, i.e., the Flower Incident; (iv) defendant prescribed plaintiff Klonopin and plaintiff developed a dependence on Klonopin; (v) plaintiff had a history of alcohol abuse; and (vi) defendant's notes indicated plaintiff had PTSD and was bipolar. Such express references are sufficient to waive the confidentiality protections that may otherwise have been afforded to the similarly high-level discussions of this information in plaintiff's emails to defendant. However, there is no evidence plaintiff disclosed information regarding defendant's prescription of anti-psychotics, including Seroquel and Risperdal. Accordingly, the Court finds plaintiff waived confidentiality with respect to the six above-listed topics contained in the emails sent to his family, but plaintiff did not waive confidentiality with respect to defendant's prescription of anti-psychotic drugs.

Third, defendant argues plaintiff authorized defendant to discuss his treatment with plaintiff's parents in emails sent to defendant on August 18, November 14, and November 21, 2019. However, a genuine issue of fact exists as to whether plaintiff authorized such disclosures to plaintiff's parents. For instance, on August 18, 2019, plaintiff told defendant "You need to

call my parents" and wrote a script for defendant in which he would apologize for his treatment of plaintiff.  (Doc. #92-14 at 23).  Similarly, on November 14, 2019, plaintiff wrote to defendant: "You are going to call both my parents," and instructed him to explain "the horror that I got in you" and "to apologize to them for what I went through under your care."  (Doc. #92-14 at 33). And on November 21, 2019, plaintiff told defendant he would take down negative reviews about defendant if "you call my mother directly and tell her how ill I was and the piece of shit I got in you."  (Doc. #92-14 at 35).  While a reasonable jury could interpret these instructions as a waiver, it could also find plaintiff did not authorize defendant to discuss the specific details of his treatment with his parents, but only to apologize.  The Court thus does not find plaintiff waived privilege as a result of these instructions to defendant.

Accordingly, the Court grants summary judgment to defendant to the extent plaintiff's claim is based on disclosures regarding the six topics contained in the emails to plaintiff's family members, but denies summary judgment with respect to defendant disclosing that he prescribed plaintiff anti-psychotic medications.

## III.   Damages

Defendant argues he is entitled to partial summary judgment on plaintiff's damages claims for (i) reduction of inheritance, (ii) physical injuries, and (iii) loss of wages and benefits, due to a complete absence of admissible evidence to support them.[3]

A defendant who breaches physician-patient confidentiality is liable for disclosing information that "results in direct economic or emotional loss to a patient."  Zim v. Benezra, 544

---

[3]      Rule 56 allows a court to enter partial summary judgment on "part of each claim or defense," including specific remedies or categories of damages. Fed. R. Civ. P. 56(a); Keywell Corp. v. Piper & Marbury L.L.P., 51 F. App'x 337 (2d Cir.2002) (summary order) (affirming grant of partial summary judgment as to punitive damages).

N.Y.S.2d 893, 894 (Sup. Ct. 1989); see also Bonner v. Lynott, 166 N.Y.S.3d 325, 330 (3d Dep't

2022).  Moreover, in order to recover, "there must be a connection or nexus between the

plaintiff's injuries and the defendant's malfeasance, such that the plaintiff has sustained damages

that are proximately caused by the alleged misconduct."  Miller v. Miller, 137 N.Y.S.3d 853, 856

(4th Dep't 2020).

     A.    Reduction of Inheritance

     Defendant argues plaintiff's claim for damages based on the reduction in his inheritance

fails due to a lack of evidence because the causal link to defendant's conduct is supported by

only conclusory allegations and unsubstantiated speculation.  Plaintiff argues the timing of the

change to the will, emails from plaintiff's mother, and other circumstantial evidence demonstrate

plaintiff's parents reduced his inheritance because of defendant's disclosure.

     Drawing all reasonable inferences in plaintiff's favor, the Court agrees with plaintiff.

Plaintiff's mother was revising her will to reduce plaintiff's inheritance by September 2020,

seven months after defendant purportedly disclosed plaintiff's emails to his parents.  In her

February 17, 2021, email informing plaintiff of his reduced inheritance, plaintiff's mother

mentioned plaintiff's emails to defendant and stated she was reducing his inheritance "because I

am a believer that all actions have consequences." [4]  (Doc. #92-15).  Moreover, when asked at

his deposition how he learned his mother was reducing his inheritance, plaintiff responded:

"Because my mother's entire demeanor after her dear friend Boris [defendant] paid a visit, her

entire demeanor towards me completely changed."  (Doc. #92-8 at 79).  A reasonable jury could

---

[4]    Although defendant argues plaintiff's medical experts, Dr. David Salvage and Dr.
Matthew Lee, "conceded" that "the only reasonable interpretation of this email is that Plaintiff's
mother reduced his inheritance as the result of his treatment of her, unrelated to any alleged
wrongdoing by Defendant" (Doc. #109 at 9), their interpretation—although reasonable—is not
the only reasonable interpretation and is not binding on the finder of fact.

thus find defendant's disclosure of plaintiff's emails was a proximate cause of plaintiff's reduced inheritance.

Accordingly, the Court denies summary judgment as to damages from the reduction in plaintiff's inheritance.

B.    Physical Injuries

Defendant argues plaintiff's claim for physical injuries fails due to a lack of evidence.  In response, plaintiff argues the unauthorized disclosure of his emails to his parents caused plaintiff such significant stress that he was unable to sleep, leading to a heart attack and gastrectomy.

The Court agrees with defendant.

Although plaintiff's medical records do not indicate a relationship between plaintiff's stress and his heart attack or gastrectomy, they also do not foreclose it as a possible cause or exacerbating factor.[5]  It is undisputed that the conditions leading to plaintiff's heart attack and gastrectomy started before the purported disclosure.  In his deposition, plaintiff testified the purported breach exacerbated his underlying conditions.  Moreover, plaintiff testified his doctor told him "stress is a huge factor in heart attacks" (Doc. #92-8 at 72), and when he asked his doctor "how much do you attribute stress to my heart attack," his doctor replied "I would attribute a lot" (id. at 51).

Importantly, however, the Court finds plaintiff has not come forward with evidence sufficient to support a jury verdict in his favor, particularly given the more than fifteen-month gap between the purported disclosure in February 2020 and the physical injuries in June and

---

[5]    To the extent defendant argues expert testimony is required to prove causation in this case, the Court disagrees, as expert testimony is only required when "the nexus between the injury and the alleged cause would not be obvious to a lay juror."  See Wills v. Amerada Hess Corp., 379 F.3d 32, 46 (2d Cir. 2004).

September 2021.  For instance, in the discrimination context, while the Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, courts in this circuit have typically measured that gap as a matter of months, not years."  Bucalo v. Shelter Island Union Free Sch. Dist., 691 F.3d 119, 131 (2d Cir. 2012); see also Meyer v. McDonald, 2017 WL 1048104, at *11 (E.D.N.Y. Mar. 20, 2017) (noting in the discrimination context that the "Second Circuit has determined that seven months is not too long to establish a causal relationship, while fifteen months or two years is too long").  Absent any other supporting evidence, and plaintiff offers none, the connection is too attenuated to be considered a proximate cause of plaintiff's injuries.  Thus, a reasonable jury could not return a verdict for plaintiff.

Accordingly, the Court grants summary judgment to defendant as to damages for plaintiff's physical injuries.

C.    Loss of Wages and Benefits

Defendant argues plaintiff's claim for loss of wages and benefits fails due to a lack of evidence.

The Court agrees.

In his affidavit, plaintiff states the unauthorized disclosure of his emails led to increased stress that caused his voice to worsen and further impaired his ability to work.  Moreover, in his supplemental report, plaintiff's economic expert, Dr. Stan V. Smith, estimated a benchmark loss of $10,000 in 2020 and 2022, and $15,000 in 2021 because of the three months plaintiff did not work due to health issues.  However, Dr. Smith's report on earnings is based largely on plaintiff's own estimates of his lost earnings, and it is unclear how these estimates differentiate between earnings plaintiff lost because of injuries to his voice that predate defendant's purported

disclosure and any injuries that purportedly occurred as a direct result of it. Absent any evidence tying these lost wages to defendant's purported breach in particular, plaintiff cannot establish proximate cause. Moreover, to the extent plaintiff claims he lost wages for the three months he could not work in 2021 due to his health issues, the connection between that and defendant's alleged breach more than fifteen months earlier is too attenuated to establish proximate cause.

In addition, plaintiff has pointed to no evidence supporting his claim for loss of benefits as a result of defendant's purported breach.

Accordingly, the Court grants summary judgment to defendant as to damages for loss of wages and benefits.

## CONCLUSION

The motion for summary judgment is GRANTED IN PART and DENIED IN PART.

Plaintiff's breach of physician-patient confidentiality claim is dismissed, except for the portion of the claim based on defendant's disclosure of him prescribing plaintiff anti-psychotic medications. Moreover, plaintiff's claim for damages is dismissed to the extent he seeks to recover damages for physical injuries or lost wages and benefits.

The Court will conduct a case management conference on **November 20, 2024, at 12:00 p.m.**, at which time counsel shall be prepared to discuss, among other things, the setting of a trial date and a schedule for pretrial submissions, as well as what good faith efforts they have made and will continue to make to settle this case.

The Clerk is instructed to terminate the motion.  (Doc. #91).

Dated: October 11, 2024
      White Plains, NY

                        SO ORDERED:

                        _____
                        Vincent L. Briccetti
                        United States District Judge